**Alex Meggitt**, OSB #174131
Oregon Justice Resource Center
P.O. Box 5248
Portland, OR 97208
ameggitt@ojrc.info
Tel: (503) 563-3354

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| EDDIE SANTOS,<br><br>    Plaintiff,<br><br>v.<br><br>NAPHCARE, INC., an Alabama corporation; WASHINGTON COUNTY, a state body in the State of Oregon; PAT GARRETT, in his capacity as Sheriff of Washington County; ROBERT DAVIS, an individual; JULIE RADOSTITZ, M.D., an individual; CASEY GLADNEY, an individual; RACHEL ECLEVIA, an individual; MARTHA ROJO, an individual; AIMEE ZERFAS, an individual,<br><br>    Defendants. | Civil No. 3:21-cv-00131-YY<br><br>**FIRST AMENDED COMPLAINT FILED WITH CONSENT OF ALL PARTIES**<br><br>CIVIL RIGHTS 42 U.S.C. § 1983 AND SUPPLEMENTAL STATE CLAIMS; DEMAND FOR DAMAGES AND ATTORNEY FEES<br><br>**JURY TRIAL DEMANDED** |

## I. INTRODUCTION

1.    For nearly eight months, Plaintiff Eddie Santos suffered in Washington County jail. Mr. Santos's time in Washington County jail caused permanent disfigurement to his hands and joints and made it impossible for him to live the life he did before, because the jail did not

Page 1 – FIRST AMENDED COMPLAINT FILED WITH CONSENT OF ALL PARTIES

allow him access to the necessary medical care that kept his chronic health conditions in check. The damage done to his body by his treatment in Washington County jail makes it difficult for Mr. Santos to lift objects, write for sustained periods of time, exercise or play sports, or even unscrew the lid from a jar, because the joints in his hands, wrists, and knees became so damaged. His incarceration also took a psychological toll on Mr. Santos, exacerbating his anxiety, depression, and PTSD as his requests for mental health assistance sometimes went unanswered for weeks on end. If Washington County jail had granted Mr. Santos consistent access to his regular medication and to decent medical care, he would not be facing these hardships today. If Washington County jail had implemented the standards of care and the recommended staffing that several years of audits had recommended, Mr. Santos would not have suffered of experienced these lasting effects.



*Mr. Santos's hands shortly after leaving Washington County jail*

## II. PARTIES

2.  Plaintiff Eddie Santos is an adult who currently resides in Clackamas County,

Page 2 – FIRST AMENDED COMPLAINT FILED WITH CONSENT OF ALL PARTIES

Oregon. At the time of the allegations made herein, Mr. Santos was held in the Washington County Jail.

3. NaphCare, Inc. was and is an Alabama corporation authorized to do business in the State of Oregon (hereinafter referred to as NaphCare). At all relevant times, NaphCare's business is providing medical services in jails and prisons nationally, and in Washington County jail specifically. At all pertinent times herein, NaphCare was acting under color of state law.

4. Washington County is an Oregon county. Washington County operates a jail in Hillsboro, Oregon, and is responsible for the provision of medical care for all detainees and persons in its custody. At all times material, Washington County contracted with NaphCare to provide all necessary medical care to detainees and persons held at the Washington County jail.

5. Based upon information and belief, Pat Garrett was acting as Sheriff of Washington County at all times relevant to this complaint. At all times herein pertinent, defendant Garrett was acting under color of state law. Based upon information and belief, defendant Garrett is a citizen and resident of the State of Oregon.

6. Based on information and belief, Robert Davis was acting as Washington County Administrator at all times relevant to this complaint. At all times relevant to this complaint, defendant Davis was acting under color of state law. Based on information and belief, defendant Davis is a citizen and resident of the State of Oregon.

7. Based on information and belief, Julie Radostitz, a licensed physician, was the chief medical health officer for NaphCare in June 2017, and at all times pertinent was responsible for the health policies, customs and procedures utilized by NaphCare employees working in the Washington County jail. At all times relevant to this complaint, defendant Radostitz was acting under color of state law. Based upon information and belief, defendant Radostitz is a citizen and resident of the State of Oregon.

8. Based on information and belief, Casey Gladney is a licensed Nurse Practitioner and employee of NaphCare. At all times relevant to this complaint, defendant Gladney was acting under color of state law. Based upon information and belief, defendant Gladney is a citizen and resident of the State of Alabama.

9. Based on information and belief, Rachel Eclevia is a licensed Registered Nurse who at all times pertinent was working for NaphCare as a registered nurse in the Washington County Jail. At all times relevant to this complaint, defendant Eclevia was acting under color of state law. Based upon information and belief, defendant Eclevia is a citizen and resident of the State of Oregon.

10. Based on information and belief, Martha Rojo is a licensed Registered Nurse who at all times pertinent was working for NaphCare as a registered nurse in the Washington County Jail. At all times relevant to this complaint, defendant Rojo was acting under color of state law. Based upon information and belief, defendant Rojo is a citizen and resident of the State of Oregon.

11. Based on information and belief, Aimee Zerfas is a licensed Registered Nurse who at all times relevant to this complaint was working for NaphCare as a registered nurse in the Washington County Jail. At all times relevant to this complaint, defendant Zerfas was acting under color of state law. Based upon information and belief, defendant Zerfas is a citizen and resident of the State of Oregon.

### III. JURISDICTION AND VENUE

12. This is a complaint for damages and attorney fees based upon defendants' violation of plaintiff's constitutional, statutory, and common law rights. This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), (4). This Court has pendent jurisdiction over plaintiff's state law negligence

Page 4 – FIRST AMENDED COMPLAINT FILED WITH CONSENT OF ALL PARTIES

claim under 28 U.S.C. § 1967.

13. Venue is proper within the District of Oregon because all the events giving rise to this claim occurred in this judicial district and because Defendants are subject to personal jurisdiction in this judicial district. 28 U.S.C. § 1391(b). The acts and practices alleged herein occurred in Washington County, Oregon.

## II. Factual Allegations

14. Washington County jail, located in Hillsboro, Oregon, houses pretrial detainees and individuals convicted of crimes. Washington County is obligated by state and federal law to provide medical and mental health care for individuals incarcerated in the Washington County jail.

15. Washington County has contracted with private healthcare organizations to provide healthcare to jail inmates and detainees since the jail opened in 1998. In 2015, the County entered into a contract with NaphCare to provide healthcare services in the jail. In exchange for a fee, NaphCare assumed all responsibility to establish a medical audit committee, to assure quality healthcare was accessible to all jail inmates and detainees; to implement all policies and procedures necessary for operation of the jail's healthcare program, to tailor specific policies and procedures for the Washington County jail as required under the standards of the National Commission on Correctional Healthcare (NCCHC); to hire, train, and supervise all healthcare staff; to implement a sufficient quality assurance program; and to maintain staffing levels determined by the contract and consistent with the standards provided by the NCCHC.

16. The Washington County Auditor's Office issued a series of three reports auditing the jail's healthcare, beginning in 2014. In its first report, released November 24, 2014, County Auditor made 27 recommendations to improve contract administration, strengthen cost controls, and reduce budget overruns. The report stated that the County Administrator agreed with all 27

Page 5 – FIRST AMENDED COMPLAINT FILED WITH CONSENT OF ALL PARTIES

of the recommendations.

17. The County Auditor had expected to close all of the recommendations related to the jail healthcare contracting process after the County contracted with NaphCare. However, the County Auditor found, in a first follow-up report dated November 19, 2015, that the County's contract with NaphCare failed to implement some recommendations related to minimum staffing, time reporting, and remedies for understaffing in the jail.

18. On April 9, 2018, the County Auditor released its third and final follow up report on its audit of jail healthcare. The report found that the County had still not implemented nine of the County Auditor's original 27 recommendations. The nine recommendations not implemented by the County and County Administrator after nearly four years were:

    a. Subjecting policies and procedures for jail healthcare to approval by the County's qualified medical professional (QMP), and having a QMP ensure the quality of jail healthcare;

    b. Requiring that the contractor's quality assurance program be approved by the County's QMP;

    c. Engaging a jail healthcare consultant, independent of the healthcare contractor, to develop minimum staffing requirements for the jail;

    d. Monitoring and enforcing compliance with minimum staffing requirements, including amending the contract to require the contractor to satisfy minimum staffing requirements by position, by day, and by shift for direct healthcare staff;

    e. Negotiating appropriate reductions in the contract fee in connection with any reductions in the scope of work;

    f. Requiring the contractor to report staffing at the same level of detail as

        staffing requirements specified in the contract;

g. Monitoring and enforcing compliance with provisions of the County's Standard Terms and Conditions included in the jail healthcare contract;

h. Specifying requirements for line healthcare staffing in the contract by number of hours per position, per day, and per shift; and

i. Engaging a third party medical billings auditor to audit hospital billings for inmate care.

19. The County Auditor's 2018 final follow up report also found that the County had partially implemented four of its recommendations, further failing to remedy understaffing and quality of care issues in the jail. Among the partially implemented suggestions, the report notes the County and County Administrator failed to institute penalties for non-performance and understaffing by NaphCare that provided a financial disincentive to understaffing.

20. On January 28, 2019, Plaintiff Eddie Santos turned himself in to Washington County Jail on a warrant.

21. Mr. Santos suffers from multiple persistent ailments, including chondrocalcinosis. Chondrocalcinosis is a progressive disease that causes calcium crystals to build up in joint cartilage. This buildup of calcium crystals causes knobby swelling and inflammation at joints, pain, stiffness, and difficulty moving. Mr. Santos was diagnosed with the disease in 2014. With his normal medication regimen and proper treatment, he would not experience serious exacerbations of the condition, and his medications would prevent buildup of the calcium deposits in his joints.

22. In order to control his chondrocalcinosis and avoid its debilitating symptoms, Mr. Santos has several prescribed medications. He must also avoid eating foods high in purine, which exacerbate his symptoms.

23. Mr. Santos brought four of his regular medications with him to the jail: norco, a pain medication; prednisone, an anti-inflammatory steroid; colchicine, a uric acid reducer also used to treat chondrocalcinosis; and cyclobenzaprine, a muscle relaxant that reduces pain around the joints. He did not bring allopurinol, also used to treat chondrocalcinosis, but his doctor had recently approved him to begin taking that medication.

24. Upon his entry to the jail Mr. Santos was held in solitary confinement in Pod 3 for 5 days. The cell was filthy, with blood and feces visible on surfaces. He did not get a shower for the 5 days he spent in the cell, despite asking the deputies to let him take a shower each day.

25. Mr. Santos did not receive his regular medications for the first few days he was in jail.

26. Although Defendants Radostitz and Gladney approved Mr. Santos's prescription for colchicine, and Defendants Eclevia, Rojo, Godney, and Zerfas, at various times administered the medication to him, they did not order or otherwise maintain a sufficient quantity to give Mr. Santos the necessary dosage of two 0.6 mg pills per day. Because of this, Mr. Santos regularly missed doses of the medication, some days receiving no colchicine at all. The missed doses caused Mr. Santos pain and irreversible damages to his hands and other extremities, as missing doses aggravates the condition and causes additional painful and irreversible buildup of calcium deposits in the joints.

27. Mr. Santos experienced exacerbations of his chondrocalcinosis throughout his time in the jail. Each flare-up of the condition caused inflammation in his joints. Each incident caused him intense pain and rendered him unable to move. These incidents included:

    a. On and around February 7, 2019, when Mr. Santos experienced swelling in his left foot, right hand and wrist, right elbow, and felt extreme pain in his

legs. At this point, Mr. Santos was housed in a cell on the upper tier of his unit. It took 10 days for medical to come see him to address his complaints. Two deputies, at about 1 in the morning on or around February 17, carried Mr. Santos down the stairs so he could be on a ground floor cell. Being moved by the deputies was one of the most painful things Mr. Santos ever experienced.

b.  On and around March 17, 2019, when Mr. Santos reported a painful inflammation in both his knees, his back, his right hip, left ankle, and both elbows.

c.  On and around April 9, 2019, when Mr. Santos reported painful inflammation in his back, right shoulder, and both knees.

d.  On and around April 16, 2019, when Mr. Santos reported additional swelling in his left foot and shoulders.

e.  On and around April 28, 2019, when Mr. Santos reported painful inflammation in his lower back, right hand, right shoulder, and both knees. For two straight days, Mr. Santos wrote medical request forms stating his uric acid level was worsening, writing "Need prednisone please."

f.  On and around May 1, 2019. On that day, Mr. Santos reported to medical staff that he was unable to move or walk. This "flare-up" lasted for about five days, during which Mr. Santos was in constant pain.

g.  On and around June 8, 2019, when Mr. Santos reported painful inflammation in his lower back and shoulder, and did not receive attention for about two days. The jail ran out of prednisone to treat Mr. Santos's condition for several days during the week of June 15.

    h. On and around July 11, 2019, when Mr. Santos reported both knees were severely swollen.

    i. On and around July 20 and 23, 2019, when the condition flared up in his left hand, shoulder, and elbow. His wrist became so swollen that his jail ID bracelet was almost cutting off blood circulation to his hand.

    j. On and around August 1, 2019, when the previous flareup remained unresolved.

28. These flareups would not have occurred, or would have been lessened in severity, if Mr. Santos had a consistent, regular dosage of colchicine or allopurinol.

29. Each time Mr. Santos reported a flareup of his condition, NaphCare staff gave him prednisone for several days until the inflammation and associated pain subsided.

30. When Mr. Santos experienced these flareups, NaphCare staff, including Defendant registered nurses and licensed nurse practitioners, gave him prednisone in 20 milligram doses, 3 times per day, which was not sufficient to alleviate his pain and suffering. When Mr. Santos asked for the 60 milligrams of prednisone all at once, which would have been effective, Naphcare staff refused to do so.

31. During times when his condition flared up, Mr. Santos was unable to move. Throughout his time in Washington County jail, other inmates in the jail would have to help Mr. Santos walk and feed himself because he could not move due to his health condition.

32. The food available at Washington County jail also exacerbated Mr. Santos's condition, and there was no option for Mr. Santos to obtain nutritious food that would not. In order to avoid or mitigate flareups of his condition, Mr. Santos needs to avoid foods that are high in purines. The regular meals and the available commissary foods did not meet Mr. Santos's

health needs, and Washington County jail was unable to provide appropriate food to him. NaphCare staff did not enter any order to allow Mr. Santos to maintain a medically necessary diet for his condition.

33. No NaphCare staff or Defendant registered nurses or licensed nurse practitioners allowed or requested an outside doctor to visit or attend to Mr. Santos, although Mr. Santos repeated asked NaphCare staff to contact his doctors and verified with his doctors that they were willing to visit him in the jail.

34. Mr. Santos also suffers from mental health issues, including Post Traumatic Stress Disorder, stemming from a 2018 incident in which a man claiming to be a law enforcement officer threatened to kill Mr. Santos while he worked as a security guard. Throughout his time in Washington County jail, Mr. Santos asked to see a mental health counselor. Although he was initially promised that he would have a weekly visit with a therapist, the counseling visits were sporadic. For instance, on June 23, 2019, he sent a request to see the mental health provider, writing, "This is my 3rd attemp[t] in 5 weeks to have mental health to come see me. I really need to talk to someone ASAP please." Throughout his stay in the jail, Mr. Santos experienced panic attacks, nightmares, waking up in cold sweats, and began exhibiting behavior including pulling the hair out of his arms due to psychological stress.

35. On or about August 9, 2019, almost 8 months after he turned himself in, Mr. Santos was released from Washington County Jail when he accepted a plea deal for a sentence of time served.

36. Mr. Santos continues to experience difficulty with his joints, particularly in his hands, where the calcium deposits had built up so much that his finger joints became knobbly and difficult to move. They will never be the same. Mr. Santos now has difficulty holding

objects and performing basic daily tasks. He is unable to even pick a penny up off of a table. Strangers react viscerally to the visible deformities in his hands. He continues to undergo physical therapy to help him regain movement. Further, his time in Washington County jail, and his treatment by staff and jail deputies, exacerbated his mental health issues.

## CLAIMS FOR RELIEF

37. Plaintiff brings a claim under 42 U.S.C. § 1983, for violations made by the named Defendants of Plaintiff's Fourteenth Amendment rights as well as state tort claims.

38. All Defendants, except Washington County, are persons within the meaning of 42 U.S.C. § 1983.

39. Plaintiff seeks an award of economic damages, non-economic damages, punitive damages, and attorney fees and litigation expenses/costs against defendants.

## FIRST CLAIM FOR RELIEF
### (42 U.S.C. § 1983 Claim for Violation of Fourteenth Amendment Rights; Against Defendants in Individual Capacity)

40. Plaintiff incorporates and realleges paragraphs 1–41 above.

41. Mr. Santos has a right under the Fourteenth Amendment of the United States constitution to adequate medical care while confined as a pretrial detainee. Defendants Radostitz, Gladney, Eclevia, Rojo, Godney, and Zerfas, and other employees and agents of NaphCare and Washington County, knew that Mr. Santos faced a substantial risk of serious harm from their acts or failures to act, but were deliberately indifferent to Mr. Santos's serious medical needs in the following areas:

    a. In failing to provide Mr. Santos with a regular and consistent supply of colchicine, thereby causing him to miss doses and seriously and irreversibly aggravating his chondrocalcinosis;

b. In failing to provide Mr. Santos with prednisone in a timely and sufficient manner and dosage to reduce his pain and suffering and otherwise alleviate his condition when he experienced flareups of his condition;

c. In failing to seek or obtain a prescription for allopurinol at any time while Mr. Santos was held in Washington County jail;

d. In failing to ensure that Mr. Santos's necessary medications were kept in stock in the jail so that he did not miss necessary doses;

e. In failing to provide prompt medical attention to Mr. Santos's serious medical needs;

f. In failing to provide Mr. Santos with a diet that would have prevented the serious and irreversible aggravation of his medical condition;

g. In failing to follow the standards published by the National Commission on Correctional Healthcare;

h. In seriously and irreversibly aggravating his medical condition by failing to allow or request an outside doctor to come and treat Mr. Santos;

i. In seriously and irreversibly aggravating his medical condition by failing to provide adequate staffing levels needed for minimally adequate care.

42. In addition, Defendants Garrett and Davis were deliberately indifferent to Mr. Santos's serious medical needs in failing to fully enact the recommendations of the Washington County Auditor, including but not limited to those regarding quality of medical care and minimum staffing levels.

43. Defendants did not take reasonable available measures to abate or reduce the risk of serious harm to Mr. Santos, even thought a reasonable state actor in their position would have understood the high risk of substantial harm to Mr. Santos.

44.  As a direct result of the actions and inactions of defendants set forth above, Mr. Santos was not provided timely and adequate medical care. If Mr. Santos had received timely and appropriate medical care, he would have been afforded the precautions and treatment that would have prevented his suffering and lasting injury. Mr. Santos spent months in agony as a result of defendants' failures and suffered irreversible damage to his hands and joints. Mr. Santos is entitled to compensatory and pecuniary damages in an amount to be determined at trial.

45.  Defendants' actions and inactions were deliberately indifferent and in reckless disregard to Mr. Santos's civil rights, and punitive damages should be awarded in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF
### (42 U.S.C. § 1983 *Monell* Claim for Violation of Fourteenth Amendment Rights; Against Defendants Washington County and NaphCare)

46.  Plaintiff incorporates and realleges paragraphs 1–47, above.

47.  Defendants NaphCare and Washington County, by and through their policymakers and supervisory staff, were aware of and chose to disregard a substantial risk that each and both of their policies, practices, and customs regarding the provision of medical care in Washington County jail would cause suffering, permanent injury, and emotional distress. Defendant NaphCare and Washington County's defective policies, practices, and customs caused Mr. Santos's pain and permanent injury and deformation. Through their policies, practices, and customs, NaphCare and Washington County ratified, directed, encouraged, and/or allowed the unconstitutional actions and omissions of Defendants and their employees or agents. The policies, practices, and customs of NaphCare and Washington County that were the moving forces in the deprivation of Mr. Santos's constitutional rights include, but are not limited to:

a.  A policy, practice and/or custom of failing or refusing to implement the recommendations of the Washington County Auditor, including but not limited to

      those regarding the quality of medical care and minimal staffing levels;

b. A policy, practice and/or custom of failing to meet widely accepted community standards of care regarding medical services for detainees or inmates who are ill and/or suffering chronic health conditions;

c. A policy, practice and/or custom of denying detainees and inmates access to appropriate, competent, and necessary care for serious medical needs.

48. Defendants Garrett and Davis had final policymaking authority for Washington County jail at all relevant times to this complaint, and their decision to implement the policies, practices, and customs described above caused Mr. Santos's injuries, both physical and emotional. Washington County is also liable for the negligence and deliberate indifference of NaphCare's deficient policies, training, and supervision, because Washington County has a nondelegable duty to ensure adequate medical care is provided to those held in the jail.

49. As a direct result of the above policies, customs or practices of NaphCare and Washington County, their employees and agents did not provide Mr. Santos timely, prompt, and necessary medical care. As a result, his chronic conditions were exacerbated, and he suffered severe physical and emotional distress and irreversible damage and disfiguration to his hands and joints. Mr. Santos is entitled to compensatory and pecuniary damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
**(42 U.S.C. § 1983 Claim for Violation of Fourteenth Amendment Rights; Against Defendants Garrett, Davis, NaphCare, and Radostitz in Supervisory Capacity)**

50. Plaintiff incorporates and realleges paragraphs 1–51 above.

51. Defendants NaphCare, Washington County, Garrett, Davis, Radostitz, and Gladney were aware of the policies, customs or practices as alleged in paragraph 49, above, and were aware that said policies, customs or practices created a substantial risk of causing substantial

harm to Washington County jail detainees and inmates by endangering their physical and mental health and safety. Despite that knowledge, these supervisors participated in, acquiesced to, and ratified the above-described policies, practices, and/or customs that deprived Mr. Santos of his constitutional rights.

52. Defendants NaphCare, Washington County, Garrett, Davis, Radostitz, and Gladney, in their supervisory capacities, failed to adequately train NaphCare staff in:

   a. The recognition of the onset and exacerbation of chronic health conditions and treatment thereof;
   b. The administration and appropriate dosage of medication;
   c. The need and requirement to maintain stock of medication for detainees' and inmates' chronic and/or recurring conditions;
   d. Providing appropriate and timely medical care.

53. Defendants NaphCare, Washington County, Garrett, Davis, Radostitz, and Gladney, in their supervisory capacities, were aware that the above-described failure to train created a substantial risk of harm to detainees and inmates in their care.

54. The conduct of NaphCare, Washington County, Garrett, Davis, Radostitz, and Gladney, in their supervisory capacities, was the moving force behind the pain, suffering, emotional distress, and permanent physical injury and irreversible exacerbation of his medical condition that Mr. Santos experienced in Washington County jail. Mr. Santos is entitled to compensatory and pecuniary damages in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**(State Tort Claim – Negligence)**

55. Plaintiff incorporates and realleges paragraphs 1–56 above.

56. Defendants NaphCare and Washington County, acting by and through their employees and agents, were negligent in one or more of the following ways:

   a. In failing to provide Mr. Santos with a regular and continuous supply of colchicine, thereby causing him to miss doses and seriously and irreversibly aggravating his chondrocalcinosis;

   b. In failing to provide Mr. Santos with prednisone in a sufficient manner and dosage to reduce his pain and suffering and otherwise alleviate his condition when he experienced flareups of his condition;

   c. In failing to seek or obtain a prescription for allopurinol at any time while Mr. Santos was held in Washington County jail;

   d. In failing to provide prompt medical attention to Mr. Santos's serious medical needs;

   e. In failing to provide Mr. Santos with a diet that would have prevented the serious and irreversible aggravation of his medical condition;

   f. In failing to follow the standards published by the National Commission on Correctional Healthcare;

   g. In seriously and irreversibly aggravating his medical condition by failing to allow or request an outside doctor to come and treat Mr. Santos;

   h. In seriously and irreversibly aggravating his medical condition by failing to provide adequate staffing levels needed for minimally adequate care.

57. As a direct result of the actions and omissions of defendants, Mr. Santos experienced pain, suffering, emotional distress, and permanent physical injury and irreversible exacerbation of his medical condition. Mr. Santos is entitled to compensatory and pecuniary damages in an amount not to exceed $500,000.00 against Defendant NaphCare, Inc. and $500,000.00 against Defendant Washington County.

58. Notice as required by the Oregon Tort Claims Act was provided to defendant

Washington County within the statutorily prescribed time frame.

## CONCLUSION

WHEREFORE, Plaintiff prays for relief as follows:

a.  For judgment in favor of Plaintiff against Defendants for his damages for each claim of relief;

b.  For reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 for his first second, and third claims for relief.

c.  For such other and further relief as this Court deems just and equitable under the circumstances.

DATED: June 1, 2021.

> */s/ Alex Meggitt*
> Alex Meggitt, OSB #174131
> Email: ameggitt@ojrc.info
> P.O. Box 5248
> Portland, OR 97208
>
> Attorney for Plaintiff